1
2
3
4                          UNITED STATES DISTRICT COURT

5                        NORTHERN DISTRICT OF CALIFORNIA

6

7    DANEASHA MONTANOCORDOBA,                Case No.  18-cv-05682-PJH

8                    Plaintiff,              **ORDER GRANTING SHIRAISHI'S
                                             MOTION FOR SUMMARY JUDGMENT
9           v.                               AND GRANTING IN PART AND
                                             DENYING IN PART CONTRA COSTA
10   CONTRA COSTA COUNTY, et al.,            COUNTY'S MOTION FOR SUMMARY
                                             JUDGMENT**
11                   Defendants.
                                             Re: Dkt. Nos. 61, 64, 67, 71
12

13          Defendants Contra Costa County's (the "County") and Detective Ann Shiraishi's

14   ("Shiraishi") (collectively, "defendants") respective motions for summary judgment came

15   on for hearing before this court on February 4, 2021.  Plaintiff Daneasha

16   Montanocordoba ("plaintiff") appeared through her counsel, Christopher S. Patterson and

17   Michael L. Fox.  The County appeared through its counsel, Patrick L. Hurley.  Shiraishi

18   appeared through her counsel, Noah G. Blechman.  Having read the parties' papers and

19   carefully considered their arguments and the relevant legal authority, and good cause

20   appearing, the court **GRANTS IN PART** and **DENIES IN PART** the County's motion and

21   **GRANTS** Shiraishi's motion for the reasons stated in this order and at the hearing.

22                                    **BACKGROUND**

23          On September 17, 2018, plaintiff filed pro se the instant action under Title 42

24   U.S.C. § 1983 against the County, Shiraishi, an unknown Sheriff's Deputy purportedly

25   named T. Jackson ("Jackson"), and the Richmond City Police Department ("RPD").  Dkt.

26   1 (Compl.).  In her complaint, plaintiff alleges the following three claims:

27       •   Violation of the Fourteenth Amendment against the County, Shiraishi, and

28           Jackson premised on interference with plaintiff's relationship with her child.

United States District Court
Northern District of California

Compl. ¶¶ 36-40.

• Violation of Fourteenth Amendment against the County premised on an unreasonable delay in processing plaintiff's arrest, detention, arraignment, and release. Id. ¶¶ 41-45.

• False Imprisonment under California state law against the County and Jackson premised on an unnecessary delay in processing plaintiff's arrest, detention, and release. Id. ¶¶ 46-49.[1]

On April 10, 2019, the court appointed Duane Morris LLP to represent plaintiff in this action. Dkt. 31. On December 22, 2020, the County filed the instant motion for summary judgment and an associated motion to seal various documents. Dkt. 61 (opening brief redacted); Dkt. 65-2 (opening brief unredacted); Dkt. 64 (motion to seal). On December 23, 2020, Shiraishi filed her motion for summary judgment. Dkt. 67. Both defendants challenge all claims against them. Dkt. 65-2 at 1-2; Dkt. 67 at 5.

At the outset, the court notes that the timing of the events at issue is important to understand plaintiff's claims. The court will detail the relevant facts as necessary below.

## I.   Plaintiff's Arrest and the Events at the Police Station

On Friday, July 14, 2017, the RPD arrested plaintiff for purportedly stabbing a third-party, Leonard Vigil ("Vigil"), at an apartment following a verbal dispute. Dkt. 70-2 at 10-12; Dkt. 62-4 at 2; Dkt. 62-8 at 2.

The parties dispute the exact time of plaintiff's arrest. Defendants contend that plaintiff was arrested at 5:01 pm. Dkt. 62-3 at 2; Dkt. 62-8 at 2. Plaintiff contends that she was detained for questioning at the apartment complex as early as 2:45 pm. Dkt. 70-2 at 40. In her declaration, plaintiff states that the RPD formally placed her under arrest at "around 4:00 pm." Dkt. 70-2 at 48 ¶ 5. Shiraishi directed plaintiff's arrest and was present at the apartment complex when it occurred. Dkt. 70-2 at 40.

[1] On November 26, 2018, plaintiff voluntarily dismissed her claims against RPD. Dkt. 12. At oral argument, plaintiff indicated that she did not intend to pursue any claims against Jackson. Dkt. 78. Thus, only the claims against the County and Shiraishi remain.

United States District Court
Northern District of California

At the time of her arrest, plaintiff stated to Shiraishi and other officers that her then eight-year old son, S.W., remained in the complex. Dkt. 70-2 at 40; Dkt. 70-2 at 49, ¶ 6. Plaintiff explained that S.W. did not live at the apartment complex. Dkt. 70-2 at 49 ¶ 6. Plaintiff further explained that S.W. could not remain in the complex because S.W.'s father, Carnell Williams ("Williams"), was in the area. Id. Plaintiff stated to the officers that Williams had a history of abuse and she had a restraining order in place against him. Id. Shiraishi located S.W. and transported S.W. to the police station. Dkt. 70-2 at 40; Dkt. 67-1 at 6 ¶ 5. Shiraishi was involved in the "booking process," Dkt. 67-1 at 6 ¶ 6, but the evidence proffered does not reflect who recorded plaintiff's 5:01 pm arrest time.

Once at the police station, Shiraishi permitted plaintiff to contact her friend, Lexus Taylor ("Taylor"), to pick up and take care of S.W. while plaintiff was in custody. Dkt. 67-1 at 6 ¶ 6; Dkt. 70-2 at 49 ¶ 7. Shortly after, both Williams and Taylor arrived at the station lobby. Dkt. 67-1 at 6 ¶ 6. Plaintiff learned about Williams' arrival. Dkt. 70-2 at 49 ¶ 7. She then explained to Shiraishi that she had full custody of S.W. and that under no circumstance should Shiraishi release S.W. to Williams' care. Dkt. 70-2 at 49 ¶ 7; Dkt. 67-1 at 6 ¶ 6. Plaintiff also explained that, because Williams has a tendency to intimidate women and he knows where Taylor lives, Shiraishi should not release S.W. to Taylor's care either. Dkt. 70-2 at 49 ¶ 7; Dkt. 67-1 at 7 ¶ 9. Shiraishi then ran a search on Williams' criminal history. She confirmed his history of domestic violence. Dkt. 67-1 at 6 ¶ 7. Shiraishi spoke to Williams. Id. at 7 ¶¶ 8-9. She then decided against placing S.W. in either Williams' or Taylor's care. Id.

Shiraishi next interrogated plaintiff about the stabbing incident. Dkt. 67-1 at 7 ¶ 10. Following the interrogation, Shiraishi decided to keep plaintiff under arrest and transfer her to the County's Martinez Detention Facility ("MDF"). Id. at ¶ 11. Following the interrogation plaintiff asked Shiraishi to permit her to contact another friend, Michael Caldwell ("Caldwell"), to pick up and take custody of S.W. Dkt. 70-2 at 49 ¶ 7. Shiraishi permitted plaintiff to do so. Id. Caldwell is plaintiff's barber. Id. ¶ 8. Plaintiff has known Caldwell since 2013 or 2014. Id. Plaintiff spoke with Caldwell. Id. Caldwell told plaintiff

that he would take care of S.W.  Id.  Plaintiff wrote a note for Caldwell detailing the

contact information of certain family located in Stockton.  Id.  Plaintiff "understood" that

Shiraishi would provide this note to Caldwell when he picked up S.W.  Id.  The police

then placed plaintiff into a holding cell at the station for the night.  Id. at 50 ¶ 9.  Plaintiff

and Shiraishi did not speak again.  Id.

At some point after plaintiff spoke with Caldwell, Caldwell spoke with Shiraishi.

Dkt. 70-2 at 49 ¶ 8; Dkt. 67-1 at 8 ¶ 12.  The parties hotly dispute what was said in that

call.  According to Shiraishi, Caldwell stated that:

> [H]e was only the plaintiff's hair barber and did not know her
> and her son well enough and did not feel comfortable becoming
> involved in this situation or retaining custody of SW.
> . . .
> I never spoke with Mr. Caldwell face-to-face and, to my
> knowledge, Mr. Caldwell never arrived at the RPD.  Dkt. 67-1
> at 8 ¶ 12.

In support of plaintiff's opposition, Caldwell submitted his own declaration detailing

his conversation with plaintiff and call with Shiraishi.  Caldwell states that:

> I received a call from [plaintiff]. She was upset and told me that
> she was being booked, and that she wanted me to pick up her
> son up from the station. I agreed to do so. Dkt. 70-2 at 55 ¶ 3.

Caldwell then adds that:

> I later received a call from Detective Anne Shiraishi of the
> Richmond Police Department. Det. Shiraishi first questioned
> me about my relationship to the family and my profession, and
> I answered her questions. I have no criminal history, I am
> financially secure, and I operate my own barber business – both
> now and at the time of the incident. I was willing and capable of
> providing a safe and comfortable environment for S.W. while
> his mother dealt with her detention. . . . Det. Shiraishi then
> began questioning me about the incident that resulted in
> [plaintiff's] arrest. . . . her questions made me uncomfortable
> about her intent. At that point, I made arrangements to pick up
> S.W. when I got off work and ended the conversation.  Id. ¶ 4.

Caldwell further adds that:

> When I got off work, I called the detective to pick up S.W. and
> headed to the station. . . . . . The detective then again began
> questioning me about the circumstances surrounding
> [plaintiff's] arrest, and if I had any information to help her
> investigation.  I told her I don't trust the police and I didn't have

4

United States District Court
Northern District of California

> any information about the incident. Her continued questioning intimidated me though, and I became concerned that I would be detained or arrested. As a result, I decided that I could not risk picking up S.W. and left the station.  Id.

Lastly, expressly refuting Shiraishi's characterization of their call, Caldwell states:

> In her declaration, Det. Shiraishi claims that I told her I did not know [plaintiff] or S.W. well enough or "feel comfortable becoming involved in this situation or retaining custody of" S.W. As outlined above, her statement is not accurate, for several reasons. First, I never told her that I did not know S.W. or [plaintiff] well. Second, I told her that I was ready and willing to take custody of S.W., and I attempted to do so by traveling to the station to pick him up. Third, she knew that I was at the station, as she spoke with me and directed me to travel to the rear of the station to pick him up.  Fourth, the only reason that I left the station was because of her continued attempts to question me about this incident – despite me already telling her that I had no involvement or personal knowledge of it in any way. I felt that she was treating me like a suspect, and I was concerned that she would attempt to detain me or implicate me in some way. Her behavior is the only reason I left the station. Id. ¶ 5.

Thus, by both Shiraishi's and Caldwell's account, the two persons never actually met at the RPD station.  In her declaration, Shiraishi states that, regardless of whether Caldwell showed up to the station, she "would not likely" have released S.W. into his custody.  Dkt. 67-1 at 8 ¶ 14.  Shiraishi then claims that, once S.W.'s placement with Caldwell fell through and because plaintiff would be transferred to MDF, she "felt [that her] only responsible option to maintain S.W.'s health and safety was to contact Costa County Child and Family Services ('CFS')."  Id. at 9 ¶¶ 15-16. Shiraishi contacted CFS and requested that it take custody of S.W.  Id. at 9 ¶ 16.  The RPD placed S.W. into CFS's custody that night. Dkt. 67-1 at 9 ¶ 18.  Based on a report provided by CFS to the Contra Costa County Superior Court, it appears that Shiraishi did not inform CFS about plaintiff's request to place S.W. with Caldwell.  Dkt. 65-4 at 4.

## II.    Plaintiff's Custody at West County and the Probable Cause Determination

On Saturday, July 15, 2017, shortly after plaintiff's arrival at MDF, the County again transferred her to the West County Detention Facility ("West County").  Dkt. 70-2 at 63.  She remained at West County until she was released from custody sometime in the afternoon on Wednesday, July 19, 2017.  Id.  While at West County, plaintiff's personal

5

1    identifying information was inaccurately entered into the County's detention system.  Dkt.

2    70-2 at 50 ¶ 10.  This error caused plaintiff difficulty in obtaining medical treatment and

3    prevented bail bond companies from identifying her for purposes of posting bail.  Id.

4        Separately, at 4:52 pm on July 15, 2017, Contra Costa County Superior Court

5    Judge Barbara Hinton ("Judge Hinton") reviewed Shiraishi's July 14, 2017 probable

6    cause declaration justifying plaintiff's arrest and detention.  Dkt. 62-8 at 2-3.  Judge

7    Hinton approved it.  Id.

8    **III.    The Meeting with CFS, CFS's Petition for a Hearing, and CFS's Report**

9        On Monday, July 17, 2017, plaintiff met with a CFS case worker, Priya Phelps

10   ("Phelps"), at West County.  Dkt 65-4 at 9-10.  At the meeting plaintiff first learned that

11   S.W. was placed in CFS's custody.  Dkt. 70-2 at 50 ¶ 10. Plaintiff then became angry,

12   throwing a chair and yelling profanities at Phelps. Dkt. 65-4 at 9-10.

13       At 3:40 pm on Tuesday, July 18, 2017, CFS filed a petition with the Contra Costa

14   County Superior Court to trigger a juvenile dependency proceeding concerning S.W.'s

15   living arrangement.  Dkt. 65-3.  Shortly after, at around 5:00 pm that day, Phelps

16   submitted a report to the court in support of the petition.  Dkt. 65-4 at 2-18.  In it, Phelps

17   describes not only the above interaction with plaintiff but also her various other

18   discussions with Shiraishi, plaintiff's relative, Roxanne Johnson ("Johnson"), S.W., and

19   Williams.  Id.  The court notes that, under California Welfare & Institutions Code § 827,

20   records concerning juvenile case files are generally kept confidential.  See Section III

21   (motions to seal analysis).  For that reason, the court will only broadly describe the

22   findings in such records that are pertinent to this action.

23       In her report, Phelps details sensitive information concerning S.W.'s prior

24   treatment.  Id.  She recommended that S.W. "be detained and remain in placement with"

25   Johnson.  Dkt. 65-4 at 15.  Phelps also noted plaintiff's ongoing incarcerated status and

26   identified the potential risk that altercations like that plaintiff purportedly engaged in with

27   Vigil posed to S.W.'s welfare.  Id.  Phelps further recommended that plaintiff be provided

28   anger management services.  Id.  That same day, Judge Hinton, (who also made the

United States District Court
Northern District of California

6

1  probable cause determination), reviewed Phelp's report.  Id. at 18.

2  **IV.  Vigil's Follow-up Statement and DDA Hast's No-Charge Decision**

3  At around 11 pm on either Friday, July 14, 2017 or Saturday, July 15, 2017 (the

4  record is ambiguous), an RPD officer ("Officer Khalfan") responded to a call from Vigil.

5  Dkt. 70-2 at 42.  Vigil retracted his prior statement that an unidentified male attacked him.

6  Id.  He stated that, in fact, plaintiff attacked him.  Id.  He explained that he did not tell the

7  truth because he did not want plaintiff to get in trouble.  Id.  He also stated that he did not

8  want any charges filed against plaintiff.  Id.  Officer Khalfan drafted his report

9  summarizing the above follow-up statements on Sunday, July 16, 2017.  Id.

10  At around 8 am on Tuesday, July 18, 2017, Shiraishi contacted Vigil about his

11  follow-up statements.  Dkt. 70-2 at 41. Vigil confirmed that he did not want to press

12  charges against plaintiff.  Id.  Shortly after, at around 8:15 am, Shiraishi contacted Contra

13  Costa County District Attorney Brian Hast ("DDA Hast") and briefed him on the incident.

14  Id. DDA Hast advised Shiraishi that he would not file charges against plaintiff.  Id.

15  **V.  The Dependency Proceedings and Plaintiff's Release**

16  On Wednesday, July 19, 2017, Judge Hinton conducted a proceeding on the

17  juvenile dependency petition filed by CFS the prior day. Dkt. 65-5 (July 19, 2017 Finding

18  and Orders After Detention Hearing).  Plaintiff attended.  She was in custody, wearing

19  shackles and handcuffs. Dkt. 70-2 at 51 ¶ 12.  According to plaintiff, Judge Hinton told

20  her that "[the judge] could not allow me to take S.W. back since I was still in custody

21  facing charges."  Id.  Plaintiff adds that, at the hearing, Judge Hinton "ask[ed] others

22  present for any additional information about the status of [her] arrest or any charges, and

23  nobody could provide her with that information."  Id.

24  Following the hearing, Judge Hinton issued an order with certain findings.  Dkt. 65-

25  5. Given the confidential nature of the dependency proceeding, this court will not detail

26  Judge Hinton's relevant findings.  However, the courts notes that they appear in part at §

27  12(c)(1) of her order.  Id. at 5, § 12(c)(1).  Ultimately, Judge Hinton decided to maintain

28  S.W. in CFS's custody.  Id.  Judge Hinton set the petition for another hearing in August

2017. Id. at 6, § 21.

Plaintiff then returned to West County.  Dkt. 70-2 at 51 ¶ 14. Later that day, the County released her without explanation.  Id.  The record does not reflect exactly when or by whom DDA Hast's no-charge decision was communicated to West County.

Following her release, plaintiff attempted to contact Shiraishi to learn about the circumstances surrounding her detention and arrest. Dkt. 70-2 at 51 ¶ 14; Dkt. 73-1 at 71-72. In response to an email sent by a victim's rights advocate on plaintiff's behalf, RPD Sergeant Nathan Lonso ("Lonso") stated in relevant part that:

> The decision to not file any charges against your client is a question that needs to be answered by the District Attorney's Office. Your client remained in custody for 72 hours because that is the standard procedure for suspects booked on felony violations. Your client's child was released to CPS after your client retracted her request to a friend of hers.  Dkt. 73-1 at 71-72.

On October 27, 2017, Judge Hinton held a jurisdiction and disposition hearing on CFS's July 18, 2017 dependency petition.  Dkt. 65-6 (October 27, 2017 Jurisdiction and Disposition Order) at 2-3. Following the hearing, Judge Hinton issued another order sustaining her prior findings.  Id. at 2, § 4. She decided that her prior order "remain[s] in effect." Id. at 3, § 9.

On May 23, 2018, Judge Hinton held another hearing on the July 17, 2017 petition. Dkt. 65-7 (May 23, 2018 Dispositional Hearing Order) at 2-3. Following the hearing, Judge Hinton issued another order finding "clear and convincing evidence" concerning S.W.'s welfare in the event he returned to plaintiff's custody.  Id. at 2, § 2. Judge Hinton again found that her "prior order" should generally remain in effect. Id. at 3, § 7.  Judge Hinton set another hearing on June 1, 2018.  Id. at 2, § 3.

On June 1, 2018, Judge Hinton held another hearing on the petition.  Dkt. 65-8 (June 1, 2018 Review and Dispositional Order) at 2-3.  Again, Judge Hinton generally kept her prior order "in effect."  Id. at 3, § 7.  In that same order, Judge Hinton transferred S.W.'s dependency proceeding to the San Mateo County Superior Court.  Id. at 3. Ultimately, on January 7, 2019, the San Mateo County Superior Court ordered S.W.

8

1  returned to plaintiff's custody.  Dkt. 62-2 at 14.

2  **VI.    The Government Code Claims Filed with the County**

3          On January 12, 2018, plaintiff filed a claim with the County pursuant to California

4  Government Code § 910, *et. seq.*.  Dkt. 75 at 4-7.  In it, plaintiff alleges that the "Contra

5  Costa County Sheriff Department acted with false imprisonment . . . by holding me in

6  custody for six days under a false name, without having any criminal charges filed

7  against me, or going to a judge."  Id. at 6, ¶ 4.  On February 6, 2018, plaintiff filed a

8  second claim with the County.  Id. at 11-20.  In it, she reattaches her January 12, 2018

9  claim, id. at 16-19, and adds other facts pertaining to her then-recent communications

10  with CFS, id. at 13-15.

11          On February 13, 2018, the County Board of Supervisors voted to "reject[] in full"

12  the claim received on January 6, 2018.  Dkt. 62-13 (February 13, 2018 Board Action

13  Letter) at 2.  In that same order, a Contra Costa County deputy clerk, Stephanie Mello

14  ("Mello") signed an affidavit certifying that she mailed a copy of that order to plaintiff that

15  same day.  Id.  Mello also filed a declaration dated December 4, 2020 testifying to that

16  same fact.  Dkt. 62-12 ¶¶ 3-4.

                              **DISCUSSION**

17

18  **I.    Legal Standard**

19          Summary judgment is proper where the pleadings, discovery, and affidavits show

20  that there is "no genuine dispute as to any material fact and the movant is entitled to

21  judgment as a matter of law." Fed. R. Civ. P. 56(a).  Material facts are those which may

22  affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

23  (1986).  A dispute as to a material fact is genuine if there is sufficient evidence for a

24  reasonable jury to return a verdict for the nonmoving party.  Id. "A 'scintilla of evidence,'

25  or evidence that is 'merely colorable' or 'not significantly probative,' is not sufficient to

26  present a genuine issue as to a material fact." United Steelworkers of Am. v. Phelps

27  Dodge Corp., 865 F.2d 1539, 1542 (9th Cir. 1989).

28          Courts recognize two ways for a moving defendant to show the absence of a

9

genuine dispute of material fact: (1) proffer evidence affirmatively negating any element of the challenged claim or (2) identify the absence of evidence necessary for plaintiff to substantiate such claim.  Nissan Fire & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1102 (9th Cir. 2000) ("In order to carry its burden of production, the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial.").  Rule 56(c)(1) expressly requires that, to show the existence or nonexistence of a disputed fact, a party must "cit[e] to particular parts of materials in the record."  Fed. R. Civ. Pro. 56(c)(1).

The party moving for summary judgment bears the initial burden of identifying those portions of the pleadings, discovery and affidavits which demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Cattrett, 477 U.S. 317, 323 (1986). Where the moving party will have the burden of proof on an issue at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party.  However, on an issue for which the opposing party will have the burden of proof at trial, the moving party need only point out "that there is an absence of evidence to support the nonmoving party's case."  Id. at 325; In re Brazier Forest Prod., Inc., 921 F.2d 221, 223 (9th Cir. 1990) ("[I]if the nonmoving party bears the burden of proof on an issue at trial, the moving party need not produce affirmative evidence of an absence of fact to satisfy its burden. The moving party may simply point to the absence of evidence to support the nonmoving party's case. The nonmoving party must then make a sufficient showing to establish the existence of all elements essential to their case on which they will bear the burden of proof at trial.") (quoting Celotex Corp. at 322-23).

"Where a moving party carries its burden of production, the nonmoving party must produce evidence to support its claim or defense."  Friedman v. Live Nation Merch., Inc., 833 F.3d 1180, 1188 (9th Cir. 2016) (internal citations omitted).  The court is only concerned with disputes over material facts and "factual disputes that are irrelevant or unnecessary will not be counted."  Anderson, 477 U.S. at 248.  It is not the task of the

court to scour the record in search of a genuine issue of triable fact. <u>Keenan v. Allen</u>, 91 F.3d 1275, 1279 (9th Cir. 1996).  The nonmoving party has the burden of identifying, with reasonable particularity, the evidence that precludes summary judgment. <u>Id.</u>

The court must view the evidence in the light most favorable to the nonmoving party: if evidence produced by the moving party conflicts with evidence produced by the nonmoving party, the judge must assume the truth of the evidence set forth by the nonmoving party with respect to that fact. <u>Tolan v. Cotton</u>, 134 S. Ct. 1861, 1865 (2014); <u>Leslie v. Grupo ICA</u>, 198 F.3d 1152, 1158 (9th Cir. 1999).  If the nonmoving party fails to produce evidence rebutting the moving party's initial showing, "the moving party is entitled to judgment as a matter of law." <u>Celotex Corp.</u>, 477 U.S. at 323.

## II.    Motions for Summary Judgment Analysis

### A.    Preliminary Evidentiary Objections

The parties raise eight evidentiary objections in their briefing.  Five of the eight objections pertain to evidence that, in any event, is immaterial or otherwise unnecessary to determine the viability of the claims at issue.  Given that, the court overrules the following objections as moot:

- Plaintiff's objection to Paul Murphy's declaration at paragraph nine.  Dkt. 70 at 12-13.
- Plaintiff's objection to a photocopy of a County detention facility wristband.  <u>Id.</u>
- Shiraishi's objection to Caldwell's declaration at paragraph five.  Dkt. 76 at 18.
- The County's objection to plaintiff's declaration at paragraph 10.  Dkt. 74 at 5-6.
- The County's objection to plaintiff's interrogatory responses.  <u>Id.</u> at 6.

That said, the remaining three objections are material to the court's decision.  The court analyzes each remaining objection in turn below.

***First***, plaintiff objects to Shiraishi's statement in paragraph 18 of her declaration that she "[is] aware and believes that Plaintiff was informed" about S.W.'s placement with CFS.  Dkt. 73 at 10.  Plaintiff asserts that the subject statement is irrelevant, lacks foundation as it is not based on personal knowledge, and is based on the inadmissible

11

hearsay statements of another.  Id.

In her reply, Shiraishi contends that the court should overrule this objection because:

> [Shiraishi] states that she is aware and believes that Plaintiff was informed about S.W. being placed in CFS custody. Plaintiff's objection seeks to challenge Det. Shiraishi's creditability, which should be done on cross-examination rather than through a foundational objection.  Dkt. 76 at 5.

At paragraph 18 of her declaration, Shiraishi states the following:

> Under Welfare and Institution Code § 305, SW was placed in the custody of Krystle Stringer with the Social Services Department of CFS, by RPD Officer Galloway and Officer Galloway signed the form. I am aware and believe that Plaintiff was informed about this arrangement and provided a copy of the Authorization for Temporary Custody form. . . . Dkt. 67-1 at 9, ¶ 18.

Federal Rule of Evidence 402 sets forth the general rules on the admissibility of relevant information. Fed. R. Evid. 402.  Information is relevant if both (1) it tends to make a fact more or less probable (i.e., probative) and (2) the fact that it is proffered to support is legally consequential (i.e., material).  Fed. R. Evid. 401.  Rule 602 permits a witness to testify to a matter "only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter.  Evidence to prove personal knowledge may consist of the witness's own testimony."  Fed. R. Evid. 602.

The court sustains this objection.  Shiraishi fails to show how she became aware that (1) "plaintiff was informed" about CFS taking custody of S.W. prior to plaintiff's conversation with Phelps or (2) plaintiff was "provided" a copy of the temporary custody authorization form.  Accordingly, the court will not consider the subject statement in its analysis of defendants' motions.

***Second***, plaintiff objects to Shiraishi's statements in paragraphs 12 through 16 of her declaration characterizing her conversation with Caldwell. Dkt. 73 at 10.  Plaintiff asserts that the subject statements by Shiraishi are hearsay.  Id.

In her opposition, Shiraishi argues that Caldwell's statements "are offered to explain" Shiraishi's action (i.e., effect on the listener), ***not*** for the truth of the matter

asserted.  Dkt. 76 at 5-6.  Thus, Shiraishi asserts, the hearsay rule does not apply.  Id.

Rule 802 generally bars the admission of hearsay evidence. Fed. R. Evid. 802.
Rule 801 defines hearsay as "a statement" that a declarant "does not make while
testifying at the current [proceeding]" and the proffering part offers "to prove the truth of
the matter asserted in the [subject] statement." Fed. R. Evid. 801.

The court overrules this objection.  As shown in the analysis below, Shiraishi
proffers the subject statements for the purpose of recounting her version of the
conversation between her and Caldwell.  Shiraishi relies on that recount as an
explanation for her decision to place S.W. with CFS.  Shiraishi does not claim that
Caldwell's statements *in fact* included true assertions.  Instead, she simply contends that
those assertions were made and, thus, persuaded her ultimate placement decision.
Accordingly, the court will consider the subject statements in its analysis below.

*Third*, the County objects to plaintiff's statement in paragraph 12 of her declaration
that Judge Hinton told plaintiff at the July 19, 2017 dependency hearing that her
incarcerated status served as a reason not to release S.W. to her custody.  Dkt. 74 at 6.
The County asserts that the subject statement qualifies as hearsay.  Id.  In particular, the
County challenges the following statement:

> On the morning of July 19, 2017, I was taken by the County to
> my son's initial dependency hearing. I was brought into the
> hearing in custody, in shackles and handcuffs, as if I was still
> facing charges for the alleged assault. I know that being forced
> to appear in custody as if I was a dangerous threat absolutely
> impacted how the judge and others saw me. ***In fact, the judge
> even told me at the hearing that she could not allow me to
> take S.W. back since I was still in custody facing charges***.
> Dkt. 73-1 at 44, ¶ 12 (emphasis added).

The County is correct that the subject statement is hearsay—(1) Judge Hinton
made the statement outside of the current proceeding and (2) plaintiff proffers it for the
truth of the matter asserted (i.e., the judge did not return S.W. to plaintiff because plaintiff
was in custody).  It does not appear that this statement falls within any of the traditional
hearsay exceptions outlined in Federal Rule of Evidence 803 or Rule 804.

That said, under the unique circumstances of this case, the court will consider the

subject statement pursuant to Rule 807's residual exception to the hearsay rule. That exception may apply if the following two conditions are satisfied:

- The statement is supported by sufficient guarantees of trustworthiness--after considering the totality of circumstances under which it was made and evidence, if any, corroborating the statement.

- It is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts.  Fed. R. Evid. 807(a)(1)-(2).

Here, Judge Hinton's July 19, 2017 Findings and Conclusions order corroborates plaintiff's account.  Notably, Judge Hinton handwrites that plaintiff "appears in custody." Dkt. 65- 3 at 2, ¶ 2(h)(1).  Also, although not dispositive (more on that below), the purported hearsay is probative for determining what drove Judge Hinton's decision to keep S.W. in CFS's custody.  It does not appear that plaintiff maintains any other reasonable means to establish her theory of what drove Judge Hinton's decision.  Given the above, the court will consider the subject statement in its analysis below.

### B.    Interference Claim Against the County

"The substantive due process right to family integrity or to familial association is well-established." Rosenbaum v. Washoe Cty., 663 F.3d 1071, 1079 (9th Cir. 2011).  "A parent has a 'fundamental liberty interest' in companionship with his or her child."  Id.  "A state may not interfere with this liberty interest, and indeed the violation of the right to family integrity is subject to remedy under § 1983."  Id.  "To amount to a violation of substantive due process, however, the harmful conduct must 'shock the conscience' or 'offend the community's sense of fair play and decency.'"  Id.

"To establish municipal liability under Monell, a plaintiff must prove that (1) he was deprived of a constitutional right; (2) the municipality had a policy; (3) the policy amounted to deliberate indifference to [his or her] constitutional right; and (4) the policy was the moving force behind the constitutional violation."  Lockett v. Cty. of Los Angeles, 977 F.3d 737, 741 (9th Cir. 2020).  Local government liability under § 1983 may arise "for

United States District Court
Northern District of California

policies of inaction as well as policies of action." <u>Jackson v. Barnes</u>, 749 F.3d 755, 763 (9th Cir. 2014). "A policy of action is one in which the government body itself violates someone's constitutional rights[] or instructs its employees to do so." <u>Id.</u> On the other hand, "a policy of inaction is based on a government body's 'failure to implement procedural safeguards to prevent constitutional violations.'" <u>Id.</u>

The Ninth Circuit has recently reiterated that in a § 1983 action, a plaintiff must "demonstrate that the defendant's conduct was the actionable cause of the claimed injury. To meet this causation requirement, the plaintiff must establish both causation-in-fact and proximate causation." <u>Bearchild v. Cobban</u>, 947 F.3d 1130, 1150 (9th Cir. 2020). In <u>Galen v. County of Los Angeles</u> (9th Cir. 2007), the Ninth Circuit acknowledged that:

> Pursuant to traditional tort law principles of causation, which we apply to § 1983 claims . . . . a judicial officer's exercise of independent judgment in the course of his official duties is a superseding cause that breaks the chain of causation linking law enforcement personnel to the officer's decision. 477 F.3d 652, 663.

Accordingly, "to withstand summary judgment," a plaintiff "must show that [law enforcement] deliberately or recklessly misled the Commissioner [i.e., judicial officer]" and that the purported constitutional violation would not have occurred "but for the officers' misrepresentations." <u>Id.</u> at 663-64.

In her complaint, plaintiff bases her interference claim against the County on the following theory:

> [The County] has a policy or custom of detaining a parent whose child has been temporarily placed in [CFS] custody past the first [CFS] hearing, even if detention is no longer reasonable or authorized so that the County may report to the court that the parent "remains in custody" and continue to separate the parent and child. Compl. ¶ 39.

In her opposition and at oral argument, plaintiff adds two interrelated theories. First, plaintiff asserts that the County has a policy of detaining arrestees "for the maximum period it believes is permitted" by California Penal Code § 825, "regardless of

15

whether charges will be filed against that person" provided that "that decision is not explicitly communicated by the County's District Attorney to the County's Sheriff."  Dkt. 70 at 15.  Second, plaintiff suggests that the County lacks a procedure for its District Attorney's Office to communicate their no-charge decisions to the Sheriff's Office.  Id. at 18.

The court grants the County's motion for summary judgment on the Monell claim premised on an unconstitutional interference with plaintiff's familial rights with S.W. for two independent reasons.

### 1.    Plaintiff Fails to Identify Evidence Showing that a County Policy Caused Her Claimed Injury

The undisputed evidence shows that Judge Hinton exercised her judgment at least three times between S.W.'s separation (the night of July 14, 2017) and his reunification with plaintiff (January 9, 2019).  Thus, absent judicial deception (which plaintiff does not argue), plaintiff cannot prove that a County policy caused her separation from S.W..

At oral argument, plaintiff suggested that, had DDA Hast's no-charge decision been communicated to Judge Hinton, then she would ***not*** have been able to rely on plaintiff's then-incarcerated status as a justification for keeping S.W. in CFS's custody.  Perhaps.  But, in her July 19, 2017 order, Judge Hinton identified other reasons relating to S.W.'s welfare to support her separation decision.  Dkt. 65-5 at 5 § 12(c)(1).  Plaintiff fails to proffer any evidence that meaningfully addresses these alternative justifications for Judge Hinton's decision.

In any event, plaintiff's suggestion addresses the separation for ***only*** the period between the first dependency hearing (July 19, 2017) and the second hearing (October 27, 2017).  Plaintiff was not detained at that second hearing.  Despite that presumably obvious fact, Judge Hinton did not order S.W. back into plaintiff's custody.  Thus, for the period between October 27, 2017 and January 9, 2019, plaintiff cannot dispute that Judge Hinton's judgment served as a superseding cause for her separation from S.W.

/ / /

16

2.      **Plaintiff Fails to Identify Evidence Showing an Actionable County Policy**

Plaintiff also fails to proffer evidence sufficient to show a triable factual issue on whether the County maintains any of the various improper detention policies that she alleges or argues.  With respect to her first theory, plaintiff proffers only ***her*** experience that the County ignored the fact that ***she*** had an important juvenile dependency proceeding.  Dkt. 70 at 17.  That anecdotal evidence does not create a triable factual issue on whether such treatment is widespread among detained parents.

With respect to her second and third theories, plaintiff relies on a declaration of a Sheriff's Office clerk, Carla Williams ("Williams").  Dkt. 70 at 15.  Plaintiff points to the following statements by Williams in her declaration:

> Pursuant to [Sheriff's Office] policy, the clerks in my department schedule the inmates for release within no later than 48 hours if they are not arraigned before then.  If the court has found probable cause to detain the inmate, and if the 48-hour period ends after court hours, the inmate will be released by the end of the following court day if the inmate has not yet been arraigned.  Dkt. 62-10 ¶ 11.
> . . .
> An inmate will be released from custody before the 48-hour arraignment deadline if the Sheriff's Office is notified that charges will not be filed against the inmate.  Id. ¶ 12.

Based on these statements' lack of a reference to a County procedure for its District Attorney's Office to communicate its no-charge decisions, plaintiff surmises that there is a triable factual issue on the absence of such a procedure.  Not so.  At best, the above-referenced statements are consistent with plaintiff's second and third theories.  They do ***not***, however, tend to establish the sort of actionable policies articulated in those theories.  As the party opposing the County's motion for summary judgment and bearing the burden of proof on the policy element at trial, plaintiff must identify evidence in the record affirmatively showing a triable factual issue on this element.  She fails to do so.

Separately, also based on the above, plaintiff suggests that Williams' statements show that the County treats California Penal Code § 825's 48-hour pre-arraignment holding period as a minimum time to detain (i.e., a floor), rather than a maximum holding

1   time to detain (i.e., a ceiling).  Perhaps.  But, as further discussed in Section II.D.,

2   California law provides that such a period is generally acceptable.  Cal. Pen. Code §

3   825(a)(1).  Plaintiff fails to proffer any authority showing that such a general rule is

4   impermissible under the federal Constitution.  Thus, even if the County does maintain a

5   policy of generally holding arrestees for the full 48 hours following their arrest and up to

6   their arraignment, plaintiff fails to show how or why such a policy is legally actionable.

7       Given the above, the court grants the County's motion for summary judgment on

8   the <u>Monell</u> claim for interference with plaintiff's right to familial relations with S.W..

9       **C.    Interference Claim Against Shiraishi**

10      In her complaint, plaintiff bases her interference claim against Shiraishi on the

11  following two theories:

12          [1] [Shiraishi] refused to comply with the agreement she made
13          with me and with my legitimate and reasonable request
            regarding who would take custody of my son during what
14          should have been the brief amount of time I was incarcerated.

15          . . .

16          [2] [Shiraishi] intentionally refused to disclose to [CFS] that I
            made arrangements for my son and falsely suggested to [CFS]
17          that I had requested that my son be taken into [CFS's] custody.
            Compl.  ¶ 36.

18      In her opposition and at oral argument, plaintiff adds three theories.  First, plaintiff

19  asserts that Shiraishi failed to notify her that, in fact, Caldwell did not take custody of

20  S.W.  Dkt. 73 at 12.  Second, plaintiff asserts that Shiraishi failed to notify CFS about

21  DDA Hast's no-charge decision.  <u>Id.</u>  Third, plaintiff asserts that Shiraishi engaged in

22  "gamesmanship" in plaintiff's inaccurately recorded arrest time.  <u>Id.</u>

23      Again, the court grants Shiraishi's motion for summary judgment for three

24  independent reasons.

25      **1.    Plaintiff Fails to Identify Evidence Showing that Shiraishi**

26          **Violated Her Right to Familial Relations with S.W.**

27      First, plaintiff fails to identify evidence sufficient to show a triable issue of fact that

28  Shiraishi's purported conduct "shocks the conscience."  With respect to her first theory,

1   plaintiff's own evidence shows that Caldwell himself decided to leave the station on July

2   14, 2017.  Dkt. 70-2 at 55 ¶ 4 ("When I got off work, I called the detective to pick up S.W.

3   . . . The detective then again began questioning me about the circumstances surrounding

4   [plaintiff's] arrest, and if I had any information to help her investigation. . . . Her continued

5   questioning intimidated me though, and I became concerned that I would be detained or

6   arrested.  As a result, I ***decided*** that I could not risk picking up S.W. and left the station.")

7   (emphasis added).  Given that decision, Shiraishi could not have "complied" with any

8   request by plaintiff to put S.W. into Caldwell's custody.

9        At oral argument, plaintiff argued that Shiraishi's questioning intimidated Caldwell

10   and, thus, constructively prevented him from taking custody of S.W.  Perhaps.  But the

11   act of posing questions to Caldwell (whatever their effect) does not come close to

12   qualifying as conscious shocking.  To the contrary, Shiraishi acted prudently by doing so:

13   Caldwell is a third-party who lacks any legal or familial relation to S.W.

14        In any event, even assuming that Caldwell was willing and able to take custody of

15   S.W., plaintiff fails to proffer any authority showing that Shiraishi was required to release

16   S.W. to Caldwell on plaintiff's request.  Shiraishi could reasonably read California Welfare

17   & Institutions Code § 305 to require her, under the circumstances, to place S.W. into CFS

18   custody.  Cal. Welf. & Inst. Code § 305(a) ("Any peace officer may, without a warrant,

19   take into temporary custody a minor: . . . When . . . the fact that the child is left

20   unattended poses an immediate threat to the child's health or safety. In cases in which

21   the child is left unattended, the peace officer shall first attempt to contact the child's

22   parent or guardian to determine if the parent or guardian is able to assume custody of the

23   child. If the parent or guardian cannot be contacted, the peace officer shall notify a social

24   worker in the county welfare department to assume custody of the child.").

25        With respect to the second theory, plaintiff fails to proffer any evidence showing

26   that Shiraishi acted intentionally when not referring to Caldwell in her police reports or the

27   information provided to CFS.  Regardless, even if Shiraishi had acted intentionally, such

28   omissions do not offend any sense of "fair play" or "decency."  Rosenbaum, 663 F.3d at

United States District Court
Northern District of California

1079.  Police reports are summary in nature.  They are not meant to include every detail.

With respect to the third theory, plaintiff fails to identify any authority that Shiraishi was required to notify her that Caldwell did not take custody of S.W.  Again, even if plaintiff had proffered such authority, a violation of such a requirement does not per se qualify as conscious shocking.  As the Supreme Court has long-recognized, "Section 1983 claims for violation of the Fourteenth Amendment should not be used as 'a font of tort law to be superimposed upon whatever systems may already be administered by the States.'"  Paul v. Davis, 424 U.S. 693, 701 (1976).

With respect to her fourth theory, plaintiff fails to identify any authority that Shiraishi was required to inform CFS about DDA Hast's no-charge decision.  As detailed above, DDA Hast made that decision on Tuesday, July 18, 2017, which is three days *after* the County transferred plaintiff out of the RPD station.  Shiraishi did not have any obligation to follow plaintiff throughout the detention process.

With respect to her final theory, plaintiff relies on evidence that does not tend to show that Shiraishi was responsible for recording her 5:01 pm booking time.  Dkt. 73 at 12-13 (citing Dkt. 62-10 ¶¶ 11-12 and Dkt. 62-11).  To the contrary, the Williams declaration (Dkt. 62-10) states that "a detention official records the date and time of the arrest," id. ¶ 11, *not* the arresting police officer (i.e., Shiraishi).  The probable cause (Dkt. 62-11) declaration schedule only generally indicates an arrestee's arraignment deadline per day and time of arrest.  Id.  It does not include any specifics about plaintiff's arrest.  Id.  Thus, even if the 5:01 pm booking time is fabricated and somehow qualifies as a constitutional violation (more on that below), plaintiff failed to identify evidence connecting Shiraishi to the claimed inaccurate recording.

Second, and independent of the above, plaintiff still cannot show that Shiraishi's decision to place S.W. in CFS custody caused her separation from S.W..  As explained in Section II.B., Judge Hinton's decisions on July 19, 2017, October 27, 2017, and May 23, 2018 qualify as superseding causes for the subject separation.

In short, because plaintiff fails to proffer sufficient evidence to show a triable

20

factual issue on any of the five theories underlying her interference claim and cannot, in any event, show that Shiraishi's conduct caused her claimed constitutional injury, the court grants Shiraishi's motion for summary judgment on these bases.

### 2.     Shiraishi Is Entitled to Qualified Immunity

Lastly, the court further finds that Shiraishi would be entitled to summary judgment based on qualified immunity.  When boiled down, the gravamen of plaintiff's claim against Shiraishi is that she improperly placed S.W. into CFS's custody.  To support her position that such conduct violates clearly established law, plaintiff relies on two cases: (1) Wallis v. Spencer, 202 F.3d 1126 (9th Cir. 2000) and (2) Ram v. Rubin, 118 F.3d 1306 (9th Cir. 1997).  Both cases are distinguishable.

First, the authorities in Wallis removed the subject children from their parents' custody pursuant to a false tip by an obviously unreliable informant (a mental patient) that the children would be sacrificed in a satanic ritual.  Wallis, 202 F.3d at 1131.  Without a court order or the consent of the parents, the authorities then directed doctors to perform an exam of each child's genitals.  Id. at 1135.  In this case, Shiraishi did not rush to remove S.W. from plaintiff's custody.  Rather, plaintiff and S.W. were separated incident to plaintiff's arrest.  Plaintiff also does not claim that S.W. underwent any invasive searches when outside her custody.

Second, the authorities in Ram removed five children from their father's home based on "two-year-old allegations" and did so "against the recommendations of investigators who were more familiar with the [underlying] allegations" of sexual abuse by the father.  Ram, 118 F.3d at 1311. The authorities took such action without notice or a hearing.  Id.  Again, Shiraishi did not go out of her way to remove S.W. from plaintiff's custody.  Shiraishi also did not rely on outdated information when placing S.W. with CFS.

In short, plaintiff fails to identify authority indicating that Shiraishi's decision to place S.W. in CFS's care amounts to a violation of a clearly established constitutional right.  Given that failure, the court finds that Shiraishi is entitled to qualified immunity.  As a result, the court grants Shiraishi's motion for summary judgment on this separate basis.

### D.    Claim for Unreasonable Delay Against the County

At the outset, the claim for unreasonable delay requires a little more explanation. In her complaint, plaintiff alleges "[t]here was an unnecessary delay in taking [her] before a judge."  Compl. ¶ 42.  She also alleges that the County has a policy of improperly permitting a "recurring situation of errors" in the "booking process."  Id. ¶ 44.  Plaintiff alleges that such errors and their resulting delays are actionable under both California Penal Code § 825 and the Due Process clause.  Id.

In her opposition, plaintiff refocuses this claim.  She principally asserts that the evidence supports finding that the County maintains two actionable policies.  First, plaintiff contends that the County maintains a practice of permitting its officers to inaccurately book a person's arrest time.  Dkt. 70 at 21, 23 n.6.  Second, plaintiff again contends that the County lacks procedures to ensure that its District Attorney's Office's no-charge decisions are timely communicated to and acknowledged by the Sherriff's Office to ensure an arrestee's immediate release.  Id. at 21-22.  In its reply, the County suggests that plaintiff improperly raised these theories for the first time in her opposition.

The court disagrees.  With respect to the first theory, plaintiff alleges numerous booking related issues in her complaint.  Compl. ¶¶ 14, 17, 22.  Given that, the County was on fair notice that inaccuracies in its booking times could form a basis of liability for this claim.  With respect to the second theory, plaintiff states that she did not learn about the timing of DDA Hast's no-charge decision until after she filed this action.  Dkt. 70-2 at 51 ¶ 14.  The court again notes that, when she filed this action, plaintiff was pro se. Given these circumstances, as well as the procedural fact that the Monell claim is literally captioned "unreasonable delay in processing," Compl ¶¶ 41-45, the court will also consider the second theory as a basis for holding the County liable on this claim.

Lastly, at oral argument, plaintiff added one more theory in support of this claim. Stated simply, she again asserts that the County treats California Penal Code § 825's 48-hour holding provision as both a floor and ceiling.

The court will consider all three theories in turn below.

### 1.    The Skewed Booking Practices Theory

The court denies the County's motion for summary judgment with respect to the first theory of the <u>Monell</u> claim for unreasonable delay.  Critically, plaintiff proffered the following evidence showing that she was arrested before 5:00 pm on July 14, 2017: (1) plaintiff's own declaration, Dkt. 70-2 ¶ 5; (2) Shiraishi's police report dated "07/14/2017 / 1553 hours" (3:53 pm) indicating that Shiraishi "requested [plaintiff] be handcuffed and transported to" the RPD station, <u>Id.</u> at 40; and (3) Officer Galloway's police report indicating that he arrived at the apartment complex "at approximately 1350 hours [1:50 pm]." <u>Id.</u> at 38.  If plaintiff's version of her arrest time is true, then, as explained below, she suffered an additional 24 hours in detention without justification.  In the court's view, whether such prolonged detention "shocks" the conscience under the Due Process clause poses a factual question that may be resolved only at trial.

Plaintiff also proffers evidence showing triable factual issues on whether the County tacitly endorses skewed 5:01 pm-like booking practices.  In his July 29, 2017 email, Sergeant Lonso states that plaintiff "remained in custody for 72 hours ***because that is the standard procedure*** for suspects booked on felony violations." Dkt. 73-1 at 71 (emphasis added).

California Penal Code § 825, however, provides the following:

> Except as provided in paragraph (2), the defendant shall in all cases be taken before the magistrate without unnecessary delay, and, in any event, within 48 hours after his or her arrest, excluding Sundays and holidays.  Cal. Penal Code § 825(a).

Stated simply, then, California law generally requires that the authorities bring an arrestee before a magistrate for an arraignment within 48 hours after his or her arrest.  That general requirement raises the question: How, then, does the County get a "standard procedure" to retain custody of suspected felons for 72 hours?  The County's reply remains noticeably silent on that question.  One potential answer: The County relies on § 825(a)(2)'s exception for after-hours booking.  That exception provides the following:

> When the 48 hours prescribed by paragraph (1) expire at a time

1

> when the court in which the magistrate is sitting is not in session, ***that time shall be extended to include the duration of the next court session on the judicial day immediately following***. If the 48-hour period expires at a time when the court in which the magistrate is sitting is in session, the arraignment may take place at any time during that session. Cal. Penal Code § 825(a)(2) (emphasis added).

2

3

4

5   Plaintiff's 5:01 pm booking time here corroborates such systemic reliance.  Without

6   an intentionally skewed booking time, the court does not see any plausible way for the

7   County to maintain the sort of standard 72-hour detention period identified by Sergeant

8   Lonso in his email.

9   To be sure, the County does proffer evidence tending to negate an inference of

10   skewed booking practices.  In her declaration, Williams states that:

11

> When inmates are booked into county jail, a detention official records the date and time of the arrest. Pursuant to CCCSO policy, the clerks in my department schedule the inmates for release within no later than 48 hours if they are not arraigned before then. Dkt. 62- 10 at 3.

12

13

14   While the County might, on the books, maintain the policy attested to by Williams,

15   it does not explain the 72-hour "standard" procedure referred to by Lonso.  Moreover, the

16   existence of a formal 48-hour policy does not necessarily preclude an informal 72-hour

17   policy (by wink and nod) in fact relied on by County agents.  At best, Williams' declaration

18   serves as one piece of evidence underlying a triable factual issue on this question.

19   That leaves only the mental state and causation elements.  In its reply, the County

20   glosses over plaintiff's purported 5:01 pm arrest time.  Aside from citing the Williams'

21   declaration, the County does not attempt to defend it or describe it as aberrational.  Given

22   such apparent endorsement, the court finds a triable factual issue on whether the County

23   is deliberately indifferent (i.e., knows but ignores) how its agents record arrest times.

24   Plaintiff has also proffered evidence to support finding a triable factual issue on

25   causation.  Critically, had plaintiff's arrest been recorded as before 5:00 pm on Friday,

26   July 14, 2017, then, pursuant to California Penal Code § 825, she would have been

27

28

United States District Court
Northern District of California

1   entitled to an arraignment no later than Tuesday, July 18, 2017.[2]  Plaintiff proffers a

2   police report by Shiraishi showing that DDA Hast made his no-charge decision on that

3   day at 8:15 am.  Dkt. 70-2 at 41.  The court presumes that DDA Hast would be required

4   to attend plaintiff's arraignment and, having already made his no-charge decision that

5   morning, of course would represent to Judge Hinton that his office would not file charges

6   against plaintiff.  In that scenario, the court also presumes Judge Hinton would order

7   plaintiff released, thereby sparing her an additional day in jail.

8        In short, because the court finds a triable factual issue on plaintiff's arrest time and

9   the underlying justification for the 72-hour hold period identified by Sergeant Lonso, the

10   court denies the County's motion for summary judgment on the skewed booking practices

11   theory of the <u>Monell</u> claim for unreasonable delay.

12            **2.**       **The Failure to Communicate No-Charge Decisions Theory**

13        The court grants the County's motion for summary judgment with respect to the

14   second theory of the <u>Monell</u> claim for unreasonable delay.  Plaintiff fails to proffer

15   evidence showing any other instance of undue detention based on the District Attorney's

16   Office's failure to inform the Sheriff's Office of its no-charge decision.  Instead, to

17   substantiate this theory, plaintiff relies on the Williams declaration.  Dkt. 70 at 15-16

18   (citing Dkt. 62-10 at 3, ¶¶ 11-13).  In her declaration, Williams states the following in

19   relevant part:

20               An inmate will be released from custody before the 48-hour

21               arraignment deadline if the Sheriff's Office is notified that
                 charges will not be filed against the inmate. Based on my

22               review of the records relating to plaintiff's incarceration in
                 county jail in 2017, I did not see anything to suggest that the

23               [Sheriff's Office] was notified that the DA's Office decided not
                 to file criminal charges against Montanocordoba. Dkt. 62-10 at

24               3, ¶ 12.

25        This statement falls far short of showing a triable factual issue on whether the

26   County systematically fails to timely communicate its no-charge decisions.  At best, it

27

28   [2] California courts construe California Penal Code § 825's reference to "holiday" to
   include Saturdays.  <u>People v. Santos</u>, 26 Cal. App. 3d 397, 403 (1972).

1  shows that, in **plaintiff's** case, DDA Hast's no-charge decision was not communicated to

2  the Sherriff's Office on the day he made it.  Given that plaintiff fails to identify evidence

3  showing that the County maintains a policy or practice of failing to timely communicate its

4  no-charge decisions, the court finds that the County is entitled to summary judgment on

5  this theory of the <u>Monell</u> claim for unreasonable delay.

**3.     The 48-Hour Holding Period Floor Theory**

6

7      At oral argument, plaintiff asserted that the County is also liable for an

8  unreasonable delay in her release because it maintains a policy of construing California

9  Penal Code § 825 to generally permit it to hold arrestees for the full 48 hours prior to an

10  arraignment.  According to plaintiff, that construction effectively ignores § 825's "without

11  unreasonable delay" clause.  Cal. Penal Code § 825(a)(1) ("Except as provided . . . the

12  defendant shall in all cases be taken before the magistrate **without unnecessary delay**,

13  and, in any event, within 48 hours after his or her arrest, excluding Sundays and

14  holidays.") (emphasis added).

15      The court grants the County's motion for summary judgment with respect to this

16  third theory of the <u>Monell</u> claim for unreasonable delay.  To the extent the County

17  construes California Penal Code § 825 as plaintiff asserts, such construction is not

18  incorrect.  By its text, that section plainly permits the County to hold an arrestee for up to

19  48 hours prior to an arraignment.  Thus, existence (or nonexistence) of triable factual

20  issues aside, the court finds that plaintiff's third theory in support of this claim is not

21  legally actionable.  Accordingly, the court finds that the County is entitled to summary

22  judgment on this theory of the <u>Monell</u> claim for unreasonable delay.

23      Given the above, the court grants the County's motion for summary judgment of

24  the claim for unreasonable delay premised plaintiff's second and third theories.  The court

25  denies that motion with respect to plaintiff's first theory supporting this claim.

26      **E.     Claim for False Imprisonment Against the County**

27      The California Tort Claims Act governs actions against public entities and public

28  employees."  <u>Cty. of Los Angeles v. Superior Court</u>, 127 Cal. App. 4th 1263, 1267 (2005).

United States District Court
Northern District of California

A plaintiff alleging a state law claim against a public entity premised on an injury to person must first present such claim to the public entity as required under California Government Code § 945. Cal. Gov't Code § 911.2. If the entity rejects such claim, then the plaintiff must initiate an action against the entity "not later than six months after written notice rejecting the claim is delivered to the claimant personally or deposited in the mail." Cty. of Los Angeles, 127 Cal. App. 4th at 1267-68. "If the public entity deposits written notice of rejection in the mail, the six- month limitations period within which to file suit applies regardless of whether notice is actually received." Id. at 1268.

The court grants the County's motion for summary judgment on the claim for false imprisonment. The County presented uncontroverted evidence that plaintiff's false imprisonment claim is time-barred. In particular, the County identifies a claim filed by plaintiff and received by the County on January 12, 2018. Dkt. 75 at 4-7. As part of that claim, plaintiff alleges that:

> [The] Contra Costa County Sheriff Department acted with false imprisonment . . . by holding me in custody for six days under a false name, without having any criminal charges filed against me, or going to a judge. Dkt. 75 at 6, ¶ 4.

On February 13, 2018, the County Board of Supervisors voted to "reject[] in full" the claim received on January 12, 2018. Dkt. 62-13 (February 13, 2018 Board Action Letter) at 2. In that same order, Mello signed an affidavit certifying that she mailed a copy of that order to plaintiff that same day. Id. Mello also filed a declaration dated December 4, 2020 testifying to that same fact. Dkt. 62-12 ¶¶ 3-4. Thus, plaintiff had until August 14, 2018 to file the instant action and allege a claim for false imprisonment. Plaintiff, however, did not file this action until September 17, 2018. Dkt. 1. Given that, the claim for false imprisonment is time-barred. As a result, the court finds that the County is entitled to summary judgment on the false imprisonment claim.

## III.   Motions to Seal Analysis

The parties request that the court seal 12 documents filed in connection with the motions for summary judgment. Dkt. 64 (County's motion to seal filed with opening brief);

1    Dkt. 71 (plaintiff's motion to seal filed with opposition to County's motion).  The parties

2    assert that the subject documents contain information concerning S.W.'s juvenile

3    dependency proceeding.  The parties explain that this information is generally protected

4    under California Welfare & Institutions Code § 827.

5         California Welfare and Institutions Code § 827 generally bars a juvenile case file

6    from public inspection.  Cal. Welf. & Inst. Code § 827(a)(1) ("Except as provided in

7    section 828, a case file may be inspected only by the following: . . . (A) Court personnel .

8    . . (B) The district attorney, a city attorney, or city prosecutor authorized to prosecute

9    criminal or juvenile cases under state law . . . (C) The minor who is the subject of the

10   proceeding . . . (D) The minor's parent or guardian . . . [then listing other specific sorts of

11   persons]").  In that same section, the California state legislature "reaffirmed" its intent that

12   juvenile court records generally "should be kept confidential."  Id. § 827(b)(1).

13        In its order, the court cites and relies on only eight of the 12 documents for which

14   sealing is sought.  Given California Welfare & Institutions Code § 827's confidentiality

15   requirement, the court finds a compelling reason to seal seven of those eight documents.

16   Those documents include the following:

17   •    The July 18, 2017 Juvenile Dependency Petition filed by CFS.  Dkt. 65-3.

18   •    The July 18, 2017 Detention/Jurisdiction Report submitted by Phelps to Judge

19        Hinton.  Dkt. 65-4.

20   •    The July 19, 2017 Findings and Orders issued by Judge Hinton.  Dkt. 65-5.

21   •    The October 27, 2017 Jurisdiction and Disposition Order issued by Judge

22        Hinton.  Dkt. 65-6.

23   •    The May 23, 2018 Dispositional Hearing Order issued by Judge Hinton.  Dkt.

24        65-7.

25   •    The June 1, 2018 Review and Dispositional Order issued by Judge Hinton.

26        Dkt. 65-8.

27   •    The various lines in the County's opening brief reflecting the above-referenced

28        information.  Compare Dkt. 65-1 (redacted version) with Dkt. 65-2 (unredacted

version).

The court also finds that the sealing these documents is narrowly tailored to protect that compelling interest. With respect to the eighth document, the court notes that plaintiff already filed it on the public docket. <u>Compare</u> Dkt. 73-1 at 71-74 (unsealed version of July 29, 2017 email from Sergeant Lonso) <u>with</u> Dkt. 71-3 (sealed version of the same). That document also does not refer to S.W.'s dependency proceeding. Thus, the court denies plaintiff's request to seal that document. Given that that document is already in the public record, plaintiff need not refile it in response to this order.

Lastly, the court does not cite and need not rely on the remaining five documents to reach its decision. Those documents include the following:

- The May 31, 2018 internal memo from CFS to Judge Hinton regarding transferring the dependency petition to San Mateo County. Dkt. 71-3 at 2-4.
- A June 18, 2018 Minute Order by the San Mateo County Superior Court accepting transfer from Contra Costa County. <u>Id.</u> at 5-7.
- A March 15, 2018 internal memo from CFS to Judge Hinton regarding S.W.'s adjustment to his living placement. <u>Id.</u> at 8-14.
- An October 27, 2017 memo from CFS to Judge Hinton regarding plaintiff's objection to S.W.'s placement with Johnson. <u>Id.</u> at 15-19.
- A January 15, 2019 Request to Change Order filed with the San Mateo County Superior Court. <u>Id.</u> at 20.

Given that the court does not refer to the above documents when ruling on the instant motions for summary judgment, it need consider whether to seal them. On that basis, the court denies plaintiff's sealing request with respect to these five documents. Within **14 days** of this order, plaintiff may withdraw these documents from the docket. If she fails to timely do so, they will become public.

## CONCLUSION

For the above reasons, the court **GRANTS** Shiraishi's motion for summary judgment in its entirety. The Court **DENIES** the County's motion for summary judgment

United States District Court
Northern District of California

1    with respect to only the <u>Monell</u> claim for unreasonable delay based on the County's

2    skewed arrest bookings time theory.  Otherwise, the court **GRANTS** the County's motion

3    for summary judgment in its entirety.  The court's order generally granting the County's

4    extends, without limitation, to the <u>Monell</u> claim premised on interference with plaintiff's

5    familial rights (under any theory), the <u>Monell</u> claim for unreasonable delay based on the

6    County's failure to communicate its District Attorney's Office's no-charge decisions, and

7    the false imprisonment claim.  The court also **GRANTS** the County's motion to seal (Dkt.

8    65) and **DENIES** plaintiff's motion to seal (Dkt. 71).  Further, pursuant to plaintiff's

9    representation at oral argument, the court **DISMISSES** any claims against Jackson with

10   prejudice.

11          In light of the above rulings, only the County remains a defendant in this action.

12   As a practical matter, the court notes that the outstanding issues in this case are narrow.

13   When boiled down, they concern the accuracy of how County officers record arrest times,

14   how widespread any inaccuracies may be, and whether the County tacitly permits its

15   officers to record inaccurate arrest times in a way that results in prolonged detention for

16   arrestees.  The court will soon issue an order referring this matter to a magistrate judge

17   for a settlement conference to occur before the parties' oppositions to any pretrial

18   motions are due.  The court will also set this matter for a short conference to discuss the

19   upcoming pre-trial and trial dates.

20          **IT IS SO ORDERED.**

21   Dated: March 3, 2021

22                                              /s/ Phyllis J. Hamilton
                                                PHYLLIS J. HAMILTON
23                                              United States District Judge

24

25

26

27

28